**In the Matter of the Alleged Mental Illness of Joseph Brock PICATACI.**

**No. C2–85–293.**

Court of Appeals of Minnesota.

May 14, 1985.

Ross A. Phelps, Phelps, Thompson & Koby, Ltd., La Crescent, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Julius Gernes, Winona Co. Atty., Ann E. Merchlewitz, Asst. Co. Atty., Winona, for State.

Heard, considered and decided by POPO-VICH, C.J., and LANSING and HUSPENI, JJ.

## OPINION

LANSING, Judge.

Joseph Picataci appeals from a January 9, 1985, judgment of commitment. We affirm the finding of mental illness but remand on the question of placement.

## FACTS

Picataci, age 31, was admitted as a mentally ill patient at St. Peter State Hospital from February 1984 until June 1984, when he was provisionally discharged. Petitioner Christine Moen Picataci, from whom Picataci was divorced in November 1984, testified that Picataci appeared stable from the time of his discharge until early August 1984. Picataci then stopped taking his prescribed psychotropic medications. He threatened to harm himself and petitioner. On August 13 and 15, 1984, Picataci insisted that the petitioner go for a ride with him in his car. On both occasions he drove at high speeds, threatened to drive the car into oncoming traffic or other obstacles, and said he would kill the petitioner if she continued the divorce proceedings. He struck her with his fist and said, "I'm going to keep beating you until your guts fall out." He also questioned her about insignificant events, such as why a welding tool had been found in a furnace duct in their home. On August 16 he was returned to St. Peter Hospital but was discharged August 24 after a six-month review hearing.

On September 6, 1984, Picataci entered Hiawatha Hall, a community group home. He continued to refuse his medication, and his behavior became more bizarre. He began sniffing his food and accused the program director and others of being romantically involved with the petitioner. Picataci left Hiawatha Hall in October or November 1984 after the staff determined he was a disruptive influence.

Petitioner testified that after leaving Hiawatha Hall, Picataci began living in his car, even though he had the financial resources to find housing because he had recently received $7,000 in social security

disability benefits. By early December the car was filled to the roof with garbage. Picataci repeatedly called petitioner, threatened suicide, and followed her around town. He frequently referred to "the game" for which he sought the solution, and he became suspicious of all public places and telephones, claiming they were "bugged." She testified that he had lost a significant amount of weight since leaving Hiawatha Hall, wore the same clothing for weeks, and neglected his hygiene. On one occasion when he came to her home, there was vomit all over his shirt. Picataci was arrested on December 18, 1984, for violating a protective order when he attempted to convince petitioner to let him into her apartment.

The court-appointed examiner, psychiatrist Gaston Loomis, supervised Picataci's hospitalization while awaiting the commitment hearing. Loomis expressed surprise to the court that Picataci cooperated when Loomis interviewed him on December 31 for the purpose of submitting a court report. In the prior week Picataci had refused medication, was uncooperative, and refused to say more than four words to Loomis. Loomis suspected Picataci was hallucinating, but Picataci refused to answer his questions about hallucinations. Although Loomis concluded Picataci's behavior was insufficient to satisfy the statutory requirements for commitment, he testified that Picataci was mentally ill due to an affective illness or mood disorder. He said in-patient care would help Picataci if he would cooperate with treatment.

A second examiner, Richard Pallazza, who was appointed at Picataci's request, also interviewed him on December 31. Pallazza, a clinical psychologist, concluded that Picataci was mentally ill and probably schizophrenic. He considered Picataci's behavior so impaired as to preclude him from functioning in the community. Although he doubted Picataci would harm himself or others, he testified that Picataci was unable to care for himself and recommended hospitalization.

The trial court made findings of fact based on this testimony and further found that less restrictive alternatives, such as out-patient supervision of medication, treatment in a group home, and voluntary admission to St. Peter, were unavailable.

Based on the findings, the trial court concluded that Picataci met the statutory requisites for commitment and ordered him committed to St. Peter State Hospital for no more than six months.

## ISSUES

1. Is the trial court's decision supported by sufficient evidence?

2. Did the trial court improperly admit the testimony of the second examiner over appellant's assertion of the statutory medical privilege?

3. Did the trial court err by making a finding based on the examiner's concern that appellant's behavior might pose a danger to the nursing staff?

## ANALYSIS

### I

■ A court may commit a person found by clear and convincing evidence to be mentally ill to the least restrictive treatment facility that can meet the patient's needs. See Minn.Stat. § 253B.09, subd. 1 (1984). A "mentally ill person" is defined as:

any person who has an organic disorder of the brain or a substantial psychiatric disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand, which (a) is manifested by instances of grossly disturbed behavior or faulty perceptions; and (b) poses a substantial likelihood of physical harm to himself or others as demonstrated by (i) a recent attempt or threat to physically harm himself or others, or (ii) a failure to provide necessary food, clothing, shelter

or medical care for himself, as a result of the impairment.

*Id.* § 253B.02, subd. 13.

Picataci argues that the trial court's determination of mental illness is unsupported by the record and that St. Peter State Hospital is not the least restrictive treatment facility. The trial court's findings will not be set aside unless clearly erroneous. *In re Fusa,* 355 N.W.2d 456, 457 (Minn.Ct.App.1984) (citing Minn.R. Civ.P. 52.01).

Both court-appointed examiners concluded that Picataci was mentally ill. Loomis said Picataci suffered from a mood disorder or affective illness and would benefit from hospitalization. Pallazza agreed that Picataci was mentally ill and stated that he needed hospitalization. He testified that Picataci was unable to care for himself, was schizophrenic with some paranoid thinking, and could not function in the community. The testimony of both examiners supported the trial court's conclusion that Picataci suffered from a substantial psychiatric disorder which grossly impaired his behavior.

Christine Picataci's testimony about his repeated threats to her safety, his suicide threats, and his failure to provide necessary food, clothing, shelter and medical care for himself after discharge from Hiawatha Hall supports the court's conclusions that Picataci's behavior was grossly disturbed and that he posed a substantial likelihood of harm to himself and others.

Picataci also argues that he should have been placed in a community facility instead of St. Peter State Hospital. If commitment is ordered, the trial court must make specific findings on less restrictive alternatives considered and rejected and the reasons for rejecting each alternative. Minn.Stat. § 253B.09, subd. 2 (1984). The trial court rejected out-patient supervision of medication, finding that supervision was unavailable at the local hospital. In addition, the trial court found that "no local group home" was available, based on social worker Gerald Polson's testimony that Hia-watha Hall would not accept Picataci until his condition stabilized. Polson's testimony was based on a conversation with the Hiawatha Hall director that occurred before December 21, 1984, when the petition was filed. However, as the court recognized in its remarks at the close of the commitment hearing, Dr. Loomis testified that Picataci *had* stabilized and placement at a local facility "may very well" have been available.

At the hearing the trial court ordered the county to investigate the availability of local placement and offered to "redraft" the commitment order to commit Picataci to a local facility rather than St. Peter. The commitment order to St. Peter was signed seven days after the hearing. At oral argument counsel informed this court that Picataci is, in fact, living at Hiawatha Hall. The rejection of community facilities appears to have been based on insufficient or inaccurate information. We remand to the trial court for findings on less restrictive alternatives and the reasons for rejecting them. The trial court may also modify the commitment order if it finds commitment to St. Peter is inappropriate.

## II

Picataci objected to the testimony of the second examiner on the ground that the testimony is an improper disclosure contrary to the statutory medical privilege contained in Minn.Stat. § 595.02, subd. 1(g) (1984). The privilege, however, is intended to protect only "those communications necessary to obtain the benefits of the examiner's training." *In re Skarsten,* 350 N.W.2d 455, 457 (Minn.Ct.App.1984). It is not applicable to the report of a second examiner who examines in preparation for trial rather than to diagnose and treat. *Id.;* Minn.Stat. § 253B.23, subd. 4. The trial court properly allowed Pallazza to testify.

## III

The trial court found:

That during the respondent's recent hospitalization, he refused to take medication and was removed from that facility by Dr. Loomis, who considered him a threat to the welfare of the nursing staff.

Picataci argues that the trial court improperly relied on Loomis' testimony because this "threat" occurred after the commitment petition was filed.

Loomis actually testified that he removed Picataci because the hospital was understaffed that night and the sole nurse on duty had no psychiatric experience. Loomis said that "if" Picataci "acted up according to his history," the nurse could not have handled him. In light of the substantial evidence from other witnesses, any error in relying on this testimony as evidence of Picataci's threatening behavior was harmless.

### DECISION

The trial court's conclusion that Picataci is mentally ill is supported by the evidence, and the court properly admitted the testimony of the second examiner. On remand the court shall make specific findings on the availability of less restrictive alternatives and may modify the commitment order if commitment is not appropriate.

Affirmed and remanded.